BOYD *v.* CROSBY LUMBER & MANUFACTURING COMPANY

No. 43053 July 1, 1964 166 So. 2d 106

*Robert L. Netterville, Alonzo H. Sturgeon,* Natchez, for appellant.

*Watson & Wilkerson,* Woodville; *Cox, Dunn & Clark,* Jackson, for appellee.

ETHRIDGE, J.

The question in this case is whether there was substantial evidence and reasonable inferences therefrom to support the decision of the Workmen's Compensation Commission that J. E. Durham, and thus Louis Fred Boyd, the appellant, was an employee of Crosby Lumber & Manufacturing Company (called Crosby), and not an independent contractor. We think there was. Reversing its attorney referee, the commission held Boyd was working under Durham for Crosby, and was therefore an employee of Crosby. It remanded the claim to its attorney referee to determine the amount of compensation due claimant for his work-connected injury. The Circuit Court of Wilkinson County reversed the commission and dismissed the claim.

I.

We state the facts and inferences from the evidence which the commission found and was justified in finding: Boyd was forty-four years of age, married with five children. He had no education, but was a capable driver of a caterpillar tractor. Crosby owns and operates a large sawmill, and has a considerable acreage of timber land. Its crews cut the timber, but Crosby entered into short-term written contracts (for one, two, or three months) with others to load and haul its logs from the woods to the mill. Durham, the alleged independent contractor, had been engaged in this type of work for Crosby for five or six years. The haulers carried the logs cut from a designated tract of timber.

When the contract expired, another was entered into. Sometimes a second contract was entered into covering the same tract of timber as covered the one which had expired. This was the case in one of the instant contracts between Crosby and Durham.

The printed form of contract in question signed by Durham was in formal terms, and stated that in consideration of $1 and other considerations, Durham agreed to load, haul and deliver logs of Crosby from the timber that Crosby owned, "within two months from the date hereof from the lands described." The logs were to be delivered to the log ramp at Crosby, Mississippi by Durham, for which Crosby agreed to pay him $17 per 1000 feet. Payments for such work were to be made twice each month. It was agreed that Crosby "is to have no control whatever over the matter, method or means of loading, hauling, delivering or handling the said logs," and that Crosby "is to hold second party (Durham) responsible only as to the result of his work as agreed to herein and not as to the means by which it is accomplished." The contract was executed by Crosby and Durham, with two witnesses.

The prices in various contracts took into consideration certain variables such as distance and terrain. Often contracts were entered into before the timber was cut. Durham had been engaged in this type of work for Crosby for five or six years, doing either all or practically all of his work for it. Another alleged independent contractor, Hightower, said he had been doing this kind of work for ten years, hauling exclusively for Crosby that entire period of time. Durham's brother did similar work for Crosby, and he "indicated that he could breach or cease work under one of defendant's contracts any time he so desired without obligation."

Durham was paid by Crosby by check on the first and fifteenth of each month. Hauling of the logs and related work performed by Durham was "an integral

part of the defendant's business and absolutely necessary to the business as defendant depended on" him and other haulers. Crosby on various occasions caused these haulers to cease their operations when weather conditions were bad, and when the mill yard was crowded with logs. The time in which Durham and his crew could haul the logs and unload them at the mill was limited by Crosby to a period between 7:00 a.m. and 4:00 p.m. daily. Durham and other haulers were directed where and how to spot trucks for unloading, and occasionally were caused delay in their operations by having to wait in line at the mill for that purpose. Further delay sometimes was caused by Crosby when Durham and his crew were waiting for logs to be cut. Crosby's land and timbermen "frequently inspected the premises and told claimant to stay off the little timber and not to mash it down, and sent him back to pick up single logs left behind." Boyd knew his job well and needed no direct supervision. Crosby sold supplies to Durham and other similar contractors on credit, and then held it out of their pay. For the purpose of operating the mill and expediting the hauling contracts, Crosby had a repair shop where these contractors had their equipment repaired. The costs of such repairs were withheld from their pay. All of the hauling for Crosby were carried out under contracts similar to those with Durham, except that done by a crew of three men who were employed directly by the company for limited purposes.

Durham hired Boyd and two other persons, fixed their rate of pay, hours of employment, and paid them by his personal checks. He directed these men in the hauling operations. Crosby did not select Boyd or the other men working under Durham, and made no deductions from their pay for social security or income withholding taxes. On March 9, 1961, while working in the woods under Durham, Boyd received injuries for which this claim was filed.

## II.

 ██ An analysis of the pertinent rules and cases . is necessary to show the reasons for affirmance of this award of compensation benefits. In general, it is said that the right to control, not actual control of, the details of the work is the primary test of whether a person is an independent contractor or an employee. Relevant characteristics or tests are usually listed, with all except the control test being considered merely indicia pointing one way or the other. See A.L.I., Rest. Agency 2d (1958), § 220, p. 485; Kisner v. Jackson, 159 Miss. 424, 132 So. 90 (1931); Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408 (1951); Shumpert Truck Lines v. Horne, 227 Miss. 648, 86 So. 2d 499 (1956). No general rule can be stated as to the weight of these elements, over fifteen in number. Their significance varies according to the facts of each particular case. The weight to be given each of the factors pertaining to the employee-contractor question is ordinarily to be decided by the trier of facts. It is the ultimate right of control, not the overt exercise of that right, which is decisive. Probably the four principal factors under the control test, are ''(1) direct evidence of right or exercise of control; (2) method of payment; (3) the furnishing of equipment; and (4) the right to fire.'' 1 Larson, Workmen's Compensation Law, § 44.

There have been a number of cases from this jurisdiction involving the employee-contractor distinction with reference to loggers and lumber haulers. In some of them the court found that the facts reflected an independent contractor relationship. Carr v. Crabtree, supra; Simmons v. Cathey-Williford & Jones Company, 220 Miss. 389, 70 So. 2d 847 (1954); Stovall v. A. Deweese Lumber Co., 222 Miss. 833, 77 So. 2d 291 (1955); Bardwell v. Perry Timber Co., 222 Miss. 854, 77 So. 2d 708 (1955); E. L. Bruce Co. v. Hampton, 225 Miss. 242, 83 So. 2d 101 (1955); Ainsworth v. Long-Bell Lum-

ber Co., 233 Miss. 38, 101 So. 2d 100 (1958); Employers Liability Ins. Co. v. Haltom, 235 Miss. 74, 108 So. 2d 29 (1959).

In other logging cases it has applied the control test, and held that the party was an employee. Sones v. Southern Lumber Co., 215 Miss. 148, 60 So. 2d 582 (1952); J. H. Marter v. Cathey-Williford-Jones Lumber Co., 225 Miss. 118, 82 So. 2d 724 (1955); Employers Ins. Co. of Alabama v. Dean, 227 Miss. 501, 86 So. 2d 307 (1956). In *Sones* the key test was whether the person "is in fact independent, free of the will of his employer— actually and substantially free from his control." It was noted that the control test stemmed largely from the common law rule in negligence cases, dealing with vicarious liability; and "the rule is even more liberal in compensation cases." The servant concept at common law performed the function of delimiting the scope of a master's vicarious tort liability. In contrast, compensation law "is concerned not with injuries *by* the employee in his detailed activities, but with injuries *to* him as a result not only of his own activities . . . but of . . . co-employees, . . . . To this issue, the right of details of his work has no such direct relation as it has to the issue of vicarious tort liability." 1 Larson, § 43.42, pp. 630-631. Further, *Sones* gave weight to the fact that the logging job was an integral part of the overall operation.

The general rule is stated thus in 1 Larson, § 45.22, p. 633:

"The hauling and loading of logs, ties, and the like have usually been classified as part of the employer's business, so as to bring within the act trucker-owners who are paid by quantity and who are free to hire their own assistants and, in some cases, to work on their own time. As shown above in connection with the question of extent of control of details, this is particularly true when the activities of the truckers must be integrated

and coordinated with the employer's over-all production pattern." Halliburton v. Texas Indemnity Ins. Co., 147 Tex. 133, 213 S.W. 2d 677 (1948); Bowser v. State I.A.C., 182 Ore. 42, 185 P. 2d 891 (1947); Burruss v. B.M.C. Logging Co., 38 N.M. 254, 31 P. 2d 263 (1934); Burchett v. Dept. of Labor and Ind., 146 Wash. 85, 261 P. 802, 263 P. 746 (1927); Hebert v. Gates, 50 So. 2d 859 (La. App. 1951); State Hwy. Comm. v. Brewer, 196 Okla. 437, 165 P. 2d 612 (1946); Blaine v. Ross Lbr. Co., 224 Ore. 227, 355 P. 2d 461 (1960).

Wade v. Traxler Gravel Co., 232 Miss. 592, 100 So. 2d 103 (1958), involving a truck owner who hauled gravel by the cubic yard, examined in depth both the control test, with reference to whether in fact the man was truly independent, and the relative nature of the work test. The commission's holding that he was an independent contractor was reversed. Wade was an employee. The fact that the hauler was paid a unit price per yard was not proof in itself he was an independent contractor. The majority of modern decisions, it was said, "involving *continuity of service* give little weight to the fact that a trucker is compensated at so much per thousand feet of logs or lumber . . . ." It was further stated that "there is a growing tendency to classify owner-drivers as employees when they perform *continuous service* which is an *integral part* of the employer's business." (Emphasis added). Ownership of the truck was not determinative. Traxler Gravel cited with approval 1 Larson, § 45, p. 657, to the following effect:

"The modern tendency is to find employment when the work being done is an integral part of the regular business of the employer, and when the worker, relative to the employer, does not furnish an independent business or professional service."

The Court then concluded:

"With these facts in mind, it cannot be doubted that the work which Wade and the other truckers performed

constituted an integral part of the regular business of the company; and we think that it cannot be said that Wade and the other truckers, relative to Traxler, were engaged in an independent business or were rendering a professional service."

In Shumpert Truck Lines v. Horne, 227 Miss. 648, 86 So. 2d 499 (1956), a truck line engaged alleged independent contractors, truck owners, to haul its freight, and Horne along with others performed this job. The court cited with approval the above statement by Larson, and said:

"In this case it is true that Shumpert did not directly employ Horne himself, but Horne was not engaged in any independent business or professional service but devoted his entire time to the business of Shumpert, delivering and picking up freight and collecting therefor, and his wages were paid out of the freight receipts of Shumpert Truck Lines. He was not an independent contractor nor was his immediate superior Harmon. To all intents and purposes, Horne was the employee of Shumpert, and Shumpert could have stopped his services as well as those of Harmon at any time."

Mississippi Employment Security Comm. v. Plumbing Wholesale Co., 219 Miss. 724, 69 So. 2d 814 (1954), although applying the control test, also considered the relative nature of the work test, the fact that the alleged independent contractor was doing the company's regular business, was an integral part of its basic operation, and was not furnishing an independent business or professional service. Bush v. Dependents of Byrd, a gravel truck case, 234 Miss. 782, 108 So. 2d 211 (1959), applied both the control and the relative nature of the work test and followed *Traxler Gravel*. See also Kahne v. Robinson, 232 Miss. 670, 100 So. 2d 132 (1958).

 ██ In short, in workmen's compensation cases Mississippi decisions and the weight of authority elsewhere hold that there are two tests to be considered in

analyzing an employee-independent contractor question: (1) the control test; and (2) the relative nature of the work test. The latter contains these ingredients: "the character of the claimant's work or business — how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job." 1 Larson, § 43.52; see Comment, Employee or Independent Contractor, 26 Miss. L.J. 250 (1955).

Appellee relies on Crosby Lumber & Manufacturing Co. v. Durham, 181 Miss. 559, 179 So. 285 (1938), and contends this is a precedent controlling here. We do not agree. D. P. Durham drove a logging truck owned by Stockstill, who executed with Crosby a contract similar in part to the present one. Durham was killed while driving this truck with defective tires. His widow sued in tort for damages. It was held that, since the evidence did not disclose exercise of any control by Crosby over Stockstill, the relation had to be determined by the contract itself, and Stockstill was an independent contractor. There were no recurring, short-term contracts over a long period of time, but only one contract for six months. In the instant case many facts reflect Crosby's right of control over J. E. Durham. His status is not determined exclusively by the contract. Moreover, we have previously held that in workmen's compensation cases the contractor-employee relation involves some different criteria than does a master's liability in tort for the act of his servant. Durham was not a workmen's compensation case, and did not involve many of the issues discussed in this opinion. It was decided over a decade

before the act was passed. Hence, because the facts are different, and it did not involve application of the workmen's compensation act, *Durham* is not in point.

## III.

 ██ ██ Applying these precedents and rules to the instant case, the question is whether there was substantial evidence and reasonable inferences therefrom to support the finding of the commission that Durham, and thus Boyd, was an employee of Crosby, and not an independent contractor. The commission was amply warranted in so finding. The question is a realistic one. Was Durham an *independent* contractor in fact, or in practical effect did Crosby have the right to control him? In any showdown Crosby assuredly would have, and in effect exercised the ultimate right to dictate the method of work, where there was any occasion to do so. As to the total operation, and Durham's relation to it, what is said in 1 Larson, § 44.20, p. 641, applies here:

". . . the whole operation was a complex and coordinated one in which the movements of the trucks had to be keyed not only to each other but to the speed of loading and the availability of logs at the loading end and of storage space at the receiving end. The timing, sequence and general disposition of truck movements in such an operation, then, is more than an 'end result'; it is an integral part of the over-all production mechanism which must be controlled to avoid chaos and disorganization."

The log hauling trucks were necessary to Crosby's business. It could and did cause Durham and other independent contractors to cease operations, when weather conditions were bad, and when the mill yard was crowded with logs. Crosby directed the time in which Durham and his crew could haul and deliver. He waited in line at the mill to unload, and was directed how and where to spot the truck for unloading. Delay was caused by

Crosby when Durham and crew were waiting for logs to be cut. Crosby's men inspected the premises, told claimant to stay off small timber and not to mash it down, and sent him back to pick up single logs left behind. Claimant needed no supervision in driving the caterpillar. Crosby sold supplies to Durham and other haulers, and held it out of their pay. It had a repair shop where Durham and others had their equipment repaired, and withheld that cost from the pay. All of the foregoing is direct evidence of the right of control of Durham.

It is also significant that Durham did not furnish an independent business. He entered into short-term written contracts, for one, two or three months. When these contracts expired others were made, sometimes covering the same tract, as in the instant case. Durham had been engaged in this type of work exclusively for Crosby for five or six years. The commission concluded that this worker did not hold himself out to the public as performing an independent business service, but regularly devoted all or most of his time to the particular employer. It was a continuing relationship with Crosby, which in substance amounted to employment, regardless of other factors. The work was regular, recurring, substantial, and exclusive, and was such a relatively large item to Durham that his relationship to Crosby could not be that of an independent businessman. See 1 Larson, § 45.31(a). These factors also constitute direct evidence of the right of Crosby to control Durham in his job. Durham's business service as a logging hauler was not independent, separate and public in relation to this particular employer.

Moreover, the method of payment is relevant in the light of all other facts. Durham was paid twice a month, and from it was withheld the costs of repairs and supplies furnished him by Crosby. This was done on a recurring basis by quantity of logs hauled. It was a

continuing service, indicating employment. The right to fire is more than a neutral factor here. The commission observed that Durham's brother, another alleged independent contractor, indicated that he could cease work under one of Crosby's contractors any time he so desired without obligation. However, the key fact is that control of Durham was perpetuated, by the devices of short-term, written contracts, renewed regularly, and Durham's working exclusively for Crosby for a number of years. He was dependent upon these additional, short-term contracts. Factors that the services are recurring and continuous, and that the alleged contractor is not engaged in fact in an independent business of his own, are important under the common-law, control test, as well as under the relative nature of the work rule. 4 Schneider, Workmen's Compensation Law (1945), §§ 1063, 1069, 1074, 1067, 1109; 99 C.J.S., Workmen's Compensation, §§ 94, 91.

Hence the control test shows, and the commission found, considerable direct evidence of the right of control of Durham by Crosby, including the method of payment and the right, at short periods, to terminate its long recurring relationship with him. See 58 Am. Jur., Workmen's Compensation, §§ 137-138; Annos., 134 A.L.R. 1029 (1941), 147 A.L.R. 828 (1943), 158 A.L.R. 915 (1945). Durham was not truly independent, performing an independent business service, but devoted all or most of his time to Crosby under such contracts for recurring services.

In addition, under the relative nature of the work test, an equally valid and pertinent one under Mississippi's workmen's compensation act, claimant's work for Durham and Crosby was an integral part of Crosby's production process, and equally necessary, Durham was not performing an independent business service. He was not in a business of his own in a realistic sense. His work was an integral part of Crosby's production

process, in which his activities had to be and were related to and coordinated with Crosby's overall production pattern. First National Bank of Oxford v. Miss. Unemployment Compensation Comm., 199 Miss. 97, 106, 23 So. 2d 534 (1945), held that a janitor of a bank, who contracted to furnish janitor service, was an employee and not an independent contractor under the Unemployment Compensation Act. Although the contention he was an independent contractor required somewhat more credulity than the present case, this statement is relevant here: "If the real relationship, under such a state of facts, could be changed by a contract device such as last mentioned, employers could write themselves out from under nearly every workmen's compensation law or unployment compensation statute in existence today."

To call Durham an independent contractor would be to ignore the absence of the required factor of independence, the development of this state's case law pertinent to the contractor-employee relation in workmen's compensation law, the purposes of the Mississippi statute, and the great weight of authority elsewhere in this field. A realistic appraisal of the facts reflects existence of an employment status.

Reversed, order of Workmen's Compensation Commission reinstated and affirmed, and cause remanded to Commission.

*Lee, C. J., and Kyle, McElroy and Rodgers, JJ.,* concur.

PATTERSON, J., dissenting:

I am sympathetic to the result reached by the decision of the majority, however, I dissent from it for the reason I fear it invades the realm of the Legislature. It is the duty of the Court to reach a just decision from the facts before it and the present applicable law. It is the duty of the Legislature to proclaim the policies and new laws of the State. I submit the following

opinion which I humbly believe to be in accord with our previous decisions and the law of this State.

This is a workmen's compensation case in which the sole question for decision is whether J. E. Durham was an employee of Crosby Lumber and Manufacturing Company or whether the relationship of Durham to such company was that of an independent contractor.

The claim of appellant, Louis Fred Boyd, arises out of an injury received by him while employed by Durham as a tractor driver. After hearing the attorney-referee found Durham to be an independent contractor and not an employee of Crosby, whereupon claimant's application for workmen's compensation benefits were denied. The Workmen's Compensation Commission reversed the attorney-referee and found claimant to be an employee of Crosby, and as such entitled to workmen's compensation benefits. The Circuit Court of Wilkinson County, upon review of the Commission's order, reversed the same and found Durham to be an independent contractor and dismissed the claim of Boyd, his employee, hence this appeal.

The appellant urges two points as error: (1) The determination made by the Commission as to questions of fact was conclusive on appeal as it was supported by substantial evidence, and the circuit court erred in overruling the Commission's finding, and (2) the finding of the attorney-referee and the circuit court that the claimant was an employee of an independent contractor is contrary to the great weight of the evidence and the law applicable to workmen's compensation cases.

The evidence is virtually without dispute. The record reflects the defendant owns and operates a sawmill and has considerable acreage of timber land. It has a crew of timber cutters for felling the timber thereon, but enters into short-term written contracts with others to load, haul and deliver its logs from the timberlands to the mill. The appellee entered into such contracts with

Durham on January 15, January 23, and March 23, 1961, for loading, hauling, and delivering logs from lands specified therein to the mill. The appellant, an employee of Durham, was injured on March 9, 1961, during the course of this employment. Durham, at the time of claimant's injury, was logging in accordance with the contract entered into between the company and himself on January 23, 1961. No question arises as to claimant's injury or his employment by Durham. In addition to claimant, Durham employed two or three other employees, as well as working himself. He owned and operated in the course of his business a tractor, a loader, and one truck. This equipment was owned by Durham without financial assistance from the appellee. In fact, the appellee furnished no equipment and had no interest in any of the equipment used in connection with this logging operation. Durham hired his own employees and paid them by personal check. He, Durham, was paid by the company on the first and fifteenth of each month on a unit basis, per thousand feet, the unit price of timber being based on the terrain and the distance the logs were hauled from the timberland to the mill. The appellee company maintained a repair shop and service station where Durham and other logging contractors could have their equipment repaired and obtain supplies for their operations. In the event use was made of the shop or supplies were obtained, the cost would be deducted from their pay checks. This repair shop and service station was maintained by the company for the use of the loggers as well as the general public. It is significant to note the contractors were under no obligation to use these facilities.

Appellee's log ramp was open from seven in the morning until four in the evening to receive logs. The trucks, on arrival, were spotted for unloading by mill employees. At times the log ramp was full and the appellee temporarily stopped the movement of logs onto the ramp until

space could be made for them by processing some of the logs on hand. The company had an employee in the nature of a superintendent or woods foreman who patrolled the company's lands, and who, on occasion, informed Durham or his employees of any logs left by inadvertence or oversight in the woods, so they might be salvaged. On one occasion he also cautioned claimant to be careful to stay off of and not mash down any young timber in his logging activity.

Durham had been engaged in this type of work with the appellee for five or six years under similar short-term written contracts, having worked for others only on one occasion for a brief time during this period. He was not a former employee of the company. His brother and several others, also loggers, testified that they had been engaged in this type of work over a period of years, hauling for the defendant under similar contracts. In fact, all of the loading, hauling and delivering of logs to the mill of appellant was carried out under these contracts with the exception of a three man logging crew employed by the company to salvage diseased or dead trees.

The appellee company required a physical examination to be made of all its employees, which fact was known to claimant since he had formerly been employed by the company. No such requirement was made by the company of Durham or his employees, including appellant. Neither were they carried on the payrolls of the company, nor were social security deductions made for them. In fact, the claimant was paid by Durham personally, and was not paid at the company office as when employed by the company.

The claimant was injured on March 9, 1961, but the injury was not reported to the appellee company until in October, 1961, approximately eight months later. From the date of his injury until Durham's death in August 1961, appellant was paid wages and medical

benefits by the decedent either personally or by accident insurance, the record not being clear as to which.

The contract of January 23, 1961, provides as follows:
"SELECTIVE CUTTING CONTRACT

"This contract made and entered into this 23 day of January, 196 1, by and between Crosby Lumber and Manufacturing Company, a corporation, hereinafter referred to as first party, and J. E. Durham , hereinafter referred to as the second party, witnesseth:

"For and in consideration of one dollar ($1.00) paid each other, receipt of which is hereby acknowledged by both, and other considerations hereinafter set out, first party and second party hereby enter into this contract, the terms of which are that second party agrees to c|u|t, load, haul, and deliver logs of first party from such timber that first party owns, and as designated for cutting by marking with paint, within two months from date hereof, on the land in Wilkinson County, Mississippi, described as follows:

"Pts. Section 8, T 3 N, R 1 E and the said logs from said land are to be c|u|t, loaded, hauled and delivered to log ramp Crosby Miss. by second party, for which first party agrees to pay second party the sum of Twelve and 50/100 dollars, per thousand feet. Said logs are to be c|u|t, loaded, hauled and delivered by second party as cut and payments therefor are to be made by first party twice each month thereafter.

"It is agreed and understood that first party is to have no control whatever over the matter, method or means of c|u|t|t|i|n|g, loading, hauling, delivering or handling the said logs by second party, it being further agreed and understood that second party is to c|u|t, land, haul and deliver to log ramp Crosby Miss. the said logs from said land that first party owns, and

is designated for cutting by marking with paint; further, first party is to hold second party responsible only as to the result of his work as agreed to herein and not as to the means by which it is accomplished.

"Witness the signature and corporate seal of the first party, CROSBY LUMBER AND MANUFACTURING COMPANY, a corporation, and the signature of second party, J. E. DURHAM, this 23 day of January, A. D., 196 1.

"CROSBY LUMBER AND MANUFACTURING COMPANY

First Party

"By R. S. TAGGART

Vice-Pres., President

"

J. E. DURHAM

Second Party

WITNESSES:
Arnold Larimore
C. A. McCurley "

The other contracts are identical with the exception of the date and location of the company's lands. In fact, there is no dispute as to the facts pertaining to the contractual arrangements of the parties thereto. The Commission did not take issue with the findings of the attorney-referee, but rather adopted such findings, reaching, however, an opposite legal conclusion from such facts, and the circuit court, on review, reached a different conclusion from the Commission and reinstated the conclusions of the attorney-referee.

This Court has repeatedly held the Workmen's Compensation Commission to be the trier of facts and this Court will not reverse the Commission's findings if the same is based on substantial evidence. Town of Mendenhall v. Ancy Lee Grubbs, Deceased, 134 So. 2d 158;

Connell v. Armstrong Tire & Rubber Co., 242 Miss. 280, 134 So. 2d 435, and the numerous cases cited therein to the same effect. We are in accord with these decisions and do not here disturb the findings of the Commission. We are of the opinion, however, the Commission erred in the legal conclusions which it reached from these facts.

The traditional test of the employer-employee relation is the right of the employer to control the details of the work. Louis A. Gily & Sons, Inc. v. Dependents of Kenneth Shankle, Deceased, 149 So. 2d 480. "The traditional test of the employer-employee relation is the right of the employer to control the details of the work. It is the ultimate right of control, under the agreement with the employee, not the overt exercise of that right, which is decisive. If the right of control of details goes no further than is necessary to ensure a satisfactory end result, it does not establish employment. The principal factors showing right of control are: (1) direct evidence of right or exercise of control; (2) method of payment; (3) the furnishing of equipment, and (4) the right to fire." 1 Larson's Workmen's Compensation Law, Sec. 44, P. 637.

Applying these tests we conclude from the specific terms of the contract exhibited and from the established facts that no control was retained or reserved by the contract and no overt act of control was exerted by the company. The mere facts of pointing out an occasional overlooked log, or in admonishing the tractor driver not to crush small timber, or in stopping the hauling while room was made on the logging ramp for additional logs in themselves are not sufficient to establish the relation of employer-employee. Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408; Stovall's Estate v. A. Deweese Lumber Company, 222 Miss. 833, 77 So. 2d 291; Reagan v. Foxworth Veneer Co., 178 Miss. 654, 174 So. 48;

Bardwell's Estate v. Perry Timber Co., 222 Miss. 834, 77 So. 2d 708.

Under similar facts and a nearly identical contract, this Court, in the case of Crosby Lumber and Manufacturing Company v. Durham, 181 Miss. 559, 170 So. 285, suggestion of error overruled, 179 So. 854, stated: ". . . It is manifest therefrom that the contract was not intended to create the relation of master and servant but to constitute Stockstill an independent contractor."

It is here well to note the statements of the circuit judge as pertains to this contract and suit, Durham v. Crosby, supra, which was introduced into the record on the trial of this cause: "The identical contract used in this case was before the Supreme Court of Mississippi in a negligence case wherein plaintiff sought to recover judgment against this defendant for an injury to an employee of the logging contractor and the company defended on the ground that the relation of independent contractor existed which precluded liability. The Supreme Court so held and there established the relation of Crosby with its loggers under this contract as that of 'independent contractor.' If the relation of independent contractor exists as proved in the above negligence case, it should prevail under the workmen's compensation act. He cannot be an independent contractor in the negligence case and then not be an independent contractor under the compensation act."

Durham v. Crosby, supra, was tried prior to enactment of the Workmen's Compensation Laws, but it has been consistently followed by this Court in many of its compensation cases, in partically all of its logging compensation cases, and the decision of the majority in effect writes it out of existence without so stating.

On the basis of the decisions of this Court it can be accurately stated that where the logger owns his own equipment, hires, pays, and directs his own employees, pays his own expenses, and delivers logs at a unit price

by contract, as in the present case, he is generally considered by the courts as well as the industry to be in business for himself and the relation existing between such logging contractor and the mill is generally held to be that of an independent contractor. Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408; Simmons v. Cathey-Williford & Jones Company, 220 Miss. 389, 70 So. 2d 847; Stovall's Estate v. A. Deweese Lumber Company, 222 Miss. 833, 77 So. 2d 291; Bardwell's Estate v. Perry Timber Company, 222 Miss. 854, 77 So. 2d 708; E. L. Bruce Company v. Hampton, 225 Miss. 242, 83 So. 2d 101. And where the customary logging contract is entered into the independent status of the logger is not destroyed because the owner inspects the cutting of logs on occasion, or the logger is told where the logs are to be placed, or his truck spotted, or, finally, the owner points out the tract to be cut prior to the execution of the contract. See Carr v. Crabtree, supra, and the other cases cited herein in this paragraph. In fact, every argument advanced by the appellant in attempting to characterize claimant as an employee of the lumber company has been expressly rejected by this Court in considering almost identical factual situations in other compensation cases herein cited; *in fact,* only three logging cases have been cited by the majority in support of their opinion, and each is readily distinguishable from the case at hand.

Sones v. Southern Lumber Company, 215 Miss. 148, 60 So. 2d 582, is clearly distinguishable by its own terms: ". . . . The solution, after all, is found in a determination from the facts whether the alleged contractor is in truth and in fact independent. Where, as in this case, the mill owner furnishes the timber to be cut and the equipment to be used in the cutting, agrees to keep the equipment in repair and to furnish the fuel for its operation, and reserves the right to terminate the arrangement at will, the so-called contractor is not in fact inde-

pendent. He is subject at all times to the will of the owner, is working only by the grace of the owner, and his employees are within the protection of the compensation law." The factual situation is so manifestly different from the case at bar that no further comment is necessary.

In Marter v. Cathey-Williford & Jones Co., 225 Miss. 118, 82 So. 2d 724, the Court noted the contractor was a former employee of the company and that the company furnished all machinery, equipment, appliances, and tools for the doing of the required work, and, further, the lumber company advanced the necessary money for the foregoing operation, including repairs to machinery and equipment, groceries for laborers, as well as furnished money for the payroll. And, finally, Employers Insurance Company of Ala. v. Dean, 227 Miss. 501, 86 So. 2d 307, is distinguishable in that the company there had reserved control of the socalled independent contractors, as is evidenced by this colloquy from the evidence:

". . . They had control of me to a certain extent. Just a verbal agreement was all.

"Q. They told you what to do on everything you done for them. Isn't that correct?

"A. That's right."

And, further, the evidence shows without equivocation that the orders of the company were carried out: "I obeyed their orders . . . . To the best of my knowledge."

In determining the question there the Court relied largely upon the fact of reserved control as stated, as well as the fact the so-called independent contractor occupied, with his wife and children, a company-owned home, and further he performed sundry duties for the company without extra compensation, all of which indicate that he was not in fact independent, and the Court correctly so found.

The most recent case upon the subject, not a logging case, is Wade v. Traxler Gravel Co., 232 Miss. 592, 100 So. 2d 103. Though portraying an excellent summation of the Workmen's Compensation Act and its effect, it is distinguishable in the first instance from the case at bar in that there was no contract. The claimant could quit at any time he so desired, and the company could discharge him at any time it desired. The claimant did not agree to haul any certain amount of gravel and specifically and perhaps more to the point the claimant there "always obeyed the instructions issued by Traxler", his employer. Additionally, Traxler was asked whether the company had any control over the hiring and firing of truck operators and his answer was, "Yes, I hire them, and when we get through with them, we let them off and tell them when we need them we will call them," and stating further that he had the right to let a truck driver go at any time without there being any liability on his part for so doing. It is significant to note in this regard that both the claimant and the company in the Traxler case testified that the claimant could quit work at any time he pleased and the company might terminate his services at any time they saw fit so to do.

By contrast, in the case at bar a formal contract was entered into in good faith, there is no evidence to the contrary, presumably, therefore, the parties intended to stand by its terms and fulfill the contract unless it can be said of the following testimony of Durham's brother that either participant had the right to terminate the contract at will without obligation. This testimony is:

"A. Well, I could just quit if I wanted to haul for them.

"Q. Would they be obligated to you if you quit?

"A. No, they ain't obligated. They only give me a contract and I sign it. If I quit it they'll get somebody else to haul it if they are so mind to."

Doubtless a chance statement of this sort should not be persuasive to reduce a legal written contract to a mere scrap of paper.

With deference, therefore, to the majority, I am of the opinion that these cases are not in point and that the long line of cases cited in Carr v. Crabtree, supra, are in point on factual situations so similar that for all practical purposes they cannot be distinguished. Under these circumstances, I am of the opinion that this Court should either follow Carr v. Crabtree, supra, Simmons v. Cathey-Williford and Jones Co., supra, Stovall's Estate v. A. Deweese Lumber Co., supra, Bardwell's Estate v. Perry Timber Co., supra, Crosby v. Durham, supra, and E. L. Bruce Co. v. Hampton, or that they should be expressly overruled.

I am of the opinion that a legal contract having been entered into between appellee and Durham pertaining to a legitimate business wherein no control was retained or reserved over the details of the work by the appellee, and none exerted as established by the facts, conclusively indicates Durham was in fact an independent contractor in his relationship with appellee and not an employee, and that the decision of the Circuit Court in denying the claim of Boyd for workmen's compensation benefits should be affirmed.

The appellant argues with considerable force, however, that the loading, hauling and delivery of logs to the log ramp of appellee is an integral part of the business of appellee and that the defense of "independent contractor" is a mere pretense, particularly since it is habitually done, thus depriving the employees of such "independent contractor" of the benefits of the Act. He urges the Court to apply a liberal construction of the workmen's compensation rules and find here the

relationship of employer-employee rather than that of independent contractor.

There can be little doubt that the appellee was motivated by a desire to be free of compensation laws in entering into these contracts, however, they are legal and evidently mutually profitable to both as they were voluntarily entered into over a period of years by Durham and others. Yet we are urged to give claimant the "benefits of the act" by a liberal construction of the compensation rules. By so doing, we would deprive Durham and others of his class, as well as Crosby, of their "benefits of the act" as independent contractors are expressly recognized therein. In this situation we turn to the ordinary rules of construction within our State.

The workmen's compensation laws were created exclusively by the legislature in derogation of the common law. The case of Crosby Lumber and Manufacturing Co. v. Durham, supra, had been decided and the principles therein announced were the law of this State at the time the workmen's compensation law was enacted. The legislature in its wisdom was aware of these announced principles and by enacting legislation in the very field of employer-employee relations which did not broaden the scope of such case, it thereby ratified the common law principles of construction placed upon a factual situation similar to the one at hand. 82 C.J.S., Presumptions to Aid Construction, Sec. 316, p. 540; Ibid., Sec. 362, p. 794. It is well settled in this State that statutes in derogation of the common law will be strictly construed. Hollman v. Bennett, 44 Miss. 322; McInnis v. State, 97 Miss. 280, 52 So. 634; Potter v. Fidelity & Deposit Co., 101 Miss. 823, 58 So. 713; and Houston v. Holmes, 202 Miss. 300, 32 So. 2d 138, wherein it is stated: "Statutes in derogation of the common law are, as a general rule, strictly construed. City of Jackson v. Wallace, 189 Miss. 252, 259, 196 So. 223, under which

rule, legislation creating a liability where no liability existed at common law should be construed most favorably to the person or entity subjected to the liability, and against the claimant for damages.'' See also Sanders v. Neely, 197 Miss. 66, 19 So. 2d 424, and contra, Priester & Son, Inc. v. Dependents of Clarence Edward Bynum, deceased, 244 Miss. 185, 142 So. 2d 30.

No terms of construction were enacted by the Legislature in its workmen's compensation laws. The only criteria for this Court to follow at that time was the common law construction as expressed in Crosby v. Durham, supra. Subsequent to this case and the enactment of the workmen's compensation law, the legislature passed Sec. 6998-01, Miss. Code 1942, as amended by House Bill 69, Laws of 1960 (approved April 23, 1960) which restricts the construction of the workmen's compensation law to ''. . . This Act shall be fairly construed according to the law and the evidence,'' thus indicating the law then in effect, which had to include Carr v. Crabtree and the numerous cases cited therein as well as Crosby v. Durham, supra. Also, in passing upon this very subject in House Bill 62, Laws of 1960 (approved April 23, 1960), the legislature recognized the existence of independent contractors and reaffirmed their legal status in this language:

'' 'Employee' means any person, including a minor whether lawfully or unlawfully employed in the service of an employer under any contract of hire or apprenticeship, written or oral, expressed or implied, provided that there shall be excluded therefrom all independent contractors. . . . . .''

By re-enactment of a statute which had been construed by the Supreme Court, the legislature in fact adopted the construction placed upon the same by this Court, and such construction is presently binding upon us. Hughes v. Gully, 170 Miss. 425, 153 So. 528; Griffin v. Jones, 170 Miss. 230, 154 So. 551; Yelverton v. Yelverton, 200

Miss. 569, 28 So. 2d 176, wherein it is stated: ". . . . we would call attention to the fact that Section 1673, Code 1906, in force when the Winkler case was decided, was later reenacted as Section 1421, Code 1930, in precisely the same words, now Section 2743, Code 1942, so that the interpretation which the Court had put upon the statute as it existed when the Winkler case was decided became a part of the statute when it was re-enacted in 1930, with the result that if any modification is to be made of what was held in the Winkler case, it must be done by the Legislature and not by us."

In fact, the workmen's compensation act included Section 6998-03, Miss. Code 1942, which permits an employer with less than eight employees the privilege of coming under the act or not, within his discretion. The legislature in its wisdom must have known that a larger company, one with more than eight employees, could use an employer with less than eight employees with no compensation coverage to a financial advantage for the apparent reason that such employer, if he chose not to come under the act, would not be burdened with the cost of compensation insurance and would, therefore, have a competitive advantage over an employer with compensation insurance. Legally and naturally larger businesses moved into this area and contracted a portion of their business to independent contractors not covered by workmen's compensation; that some of this work contracted is of a dangerous nature cannot be disputed, however, this area was left by the legislature and in the absence of a clear legislative mandate this Court should not by judicial decision bridge this gap, especially in view of Section 6998-01, Miss. Code 1942, which restricts the construction of the workmen's compensation law to, and we repeat, "This Act shall be fairly construed according to the law and the evidence." I do not believe this Court should substitute Larson's Workmen's Compensation Law, though concededly it is a fine authority,

for the prior decisions and statutes of this State. (Emphasis ours)

I am of the opinion that the order of the circuit court overruling the order of the Commission and reinstating the order of the attorney-referee should be affirmed.

*Jones and Brady, JJ.*, joins in this dissent.

GILLESPIE, J.; dissenting:

I concur in the dissenting opinion of Justice Patterson, but I do not believe that the cases cited therein, holding that statutes in derogation of the common law are as a general rule strictly construed, have any application to the case at bar.